Theo W. KELLEY, Executor of the Estate of Roland Bev Kelley, Deceased, Plaintiff,

v.

The CENTRAL NATIONAL BANK OF RICHMOND, Executor of the Estate of Phil Errington Trimmer, Jr., Deceased, Defendant.

Civ. A. No. 6–71–R.

United States District Court, E. D. Virginia, Richmond Division.

July 17, 1972.

Colson & Hicks, Miami, Fla., for plaintiff; Allen, Allen, Allen & Allen, Richmond, Va., of counsel.

Bowles & Boyd and McGuire, Woods & Battle, Richmond, Va., for defendant.

## MEMORANDUM OPINION AND ORDER

OREN R. LEWIS, District Judge.

Dr. Philip E. Trimmer, Jr. and Roland Bev Kelley went to Florida in Dr. Trimmer's Piper aircraft to play some golf. They landed at Pompano Airpark late in the evening of January 1, 1969—Dr. Trimmer had the airplane serviced and tied down for their stay.

They returned to Pompano Airpark between ten thirty and eleven o'clock on the morning of January 5, 1969 and proceeded to check out preparatory to flying back to Richmond, Virginia. Dr. Trimmer returned the Avis rental car and paid for the tie-down and gasoline charges in cash. Their luggage was transferred from the rental car to Dr. Trimmer's airplane by one of the airpark employees.

It was then raining and the airpark manager-receptionist asked Dr. Trimmer if it was necessary that he leave then as the weather was very bad in Pompano —The doctor replied that he had to get back to Richmond—"My patients will be waiting." The manager-receptionist then asked the doctor if he wanted her

to call Flight Service for him and he said no, he was not going to file a flight plan—His words were to the effect that he did not think he could get the clearance that was required.

The manager-receptionist talked with them on the unicom as they were preparing for take-off—Pompano had no control tower. The doctor asked what the winds were and what runway to use —She gave him the information and went to the back window and watched them take off—Dr. Trimmer was in the pilot's seat—Mr. Kelley was in the passenger seat.

The weather was bad when the plane took off—The manager-receptionist could not see it shortly after it had cleared the field—It was very cloudy and rainy.

At 12:12 p. m. Dr. Trimmer reported to Vero Beach radio that he was ten miles SSE at Vero Beach, cruising at twelve hundred feet VFR, destination Richmond, Virginia. He requested the weather at Melbourne and at Daytona Beach, Florida, and was given Miami AIRMET ALPHA 8 and current weather and terminal forecasts for Melbourne, Daytona Beach and Vero Beach. All except Daytona Beach indicated that weather conditions, current and forecast, were unfavorable, with ceilings and visibility frequently below one thousand feet and two miles with rain, fog and occasional moderate turbulence in embedded showers. Dr. Trimmer acknowledged receipt of the information.

No further word was heard from Dr. Trimmer or Mr. Kelley—They were reported missing—Air search commenced on Monday, January 6, 1969, extending from Stuart to Daytona Beach, Florida —The mission was continued and expanded throughout the next three days.

Late Thursday afternoon a CAP air search crew spotted what appeared to be submerged objects about twenty-four hundred yards off shore east of Melbourne Beach—Ensuing bad weather prohibited the Coast Guard from recovering the submerged objects.

Neither the airplane, any debris therefrom nor the bodies of Dr. Trimmer and Mr. Kelley have been recovered as of this date. Both Dr. Trimmer and Mr. Kelley are presumed to have died.

This suit for wrongful death in the admiralty section of this court followed.

The executor of the estate of ROLAND Bev Kelley alleged that the death of Mr. Kelley was the proximate result of the careless, reckless and negligent manner in which Philip E. Trimmer, Jr., deceased, piloted, commanded, supervised, inspected, navigated, maintained and operated the said aircraft, and especially for his failure to avoid weather conditions which constituted an unreasonable risk and hazard to his proper and safe operation of the said aircraft.

The executor of the estate of Philip E. Trimmer, Jr., deceased, denied all of the alleged acts of negligence—asserted the defenses of contributory negligence and assumption of risk on the part of Mr. Kelley, and questioned the jurisdiction of this Court to hear and determine the matter.

■ The Court finds it has jurisdiction under its general maritime and admiralty jurisdiction, 28 U.S.C. § 1333.

■ Every specie of tort, however occurring and whether on board a vessel or not, if upon the high seas or navigable waters, has an admiralty cognizance. See The Plymouth, 3 Wall. 20, 70 U.S. 20, at p. 36, 18 L.Ed. 125 (1865). See also Weinstein v. Eastern Airlines, 316 F.2d 758 (3rd Cir. 1963).

The missing aircraft was last reported to be some ten miles SSE of Vero Beach en route to Richmond, Virginia.

A member of a CAP search crew spotted submerged objects about twenty-four hundred yards off shore east of Melbourne Beach in about forty feet of water. This observer thought the submerged objects were parts of the missing airplane they were then looking for —He described what he saw in some detail—The searching aircraft circled the

spot for some time and radioed for a Coast Guard vessel to come to the scene.

The cutter did not reach the scene until the next morning—The divers could not enter the water due to the presence of sharks—A marker buoy was placed on the spot and arrangements were made for a Navy diving team to embark with the cutter on Sunday.

High winds causing sixteen-foot seas washed the marker buoy away—preventing the cutter from sending divers down until the following Thursday—By then the submerged objects could not be found.

No other aircraft was reported missing in the area in question. It does not follow from the fact that the submerged objects were never recovered that they were not there.

The Court concludes from the evidence presented that the objects seen beneath the surface of the ocean off Melbourne Beach in the navigable waters of Florida were the remains of the aircraft in question.

 The real question here is whether the estate of Dr. Trimmer is liable for the death of Roland Bev Kelley. It is well settled that the burden of proof in aircraft cases is on the plaintiff to prove by a preponderance of evidence the negligence of the defendant and that such negligence was the proximate cause of the accident.

The record here made discloses that the airplane in question carried standard equipment, including dual controls, and that it was in an airworthy condition on the date in question—that Dr. Trimmer had held a private pilot's license, ASEL rating, since 1967 and that he had had some three hundred hours of flying experience—He was taking IFR training courses but was not licensed to fly IFR.

Roland Bev Kelley was a so-called student pilot with some thirteen hours of flying time—He had flown with Dr. Trimmer on numerous occasions. They were on a golfing vacation during the dates in question. Dr. Trimmer was the pilot—Mr. Kelley rode in the passenger seat.

It was not good flying weather when Dr. Trimmer and Mr. Kelley took off from Pompano Beach—It was very cloudy and rainy—You could not see very well—The ceiling was estimated to be about three hundred feet at the time of the take-off.

The take-off was without incident. Dr. Trimmer was flying at twelve hundred feet VFR when he was some ten miles SSE of Vero Beach—some eighty-five nautical miles from Pompano. The weather conditions, current and forecast, were unfavorable, with ceiling and visibility frequently below one thousand feet and two miles with rain, fog and occasional moderate turbulence in embedded showers.

A VFR private pilot with eight years' flying experience flew from Vero Beach to Pompano on the morning of January 5, 1969. He left Vero Beach around nine o'clock in the morning and arrived at Pompano at ten or ten fifteen—It was then raining real hard—He was in and out of showers from Vero. The ceiling was from two hundred fifty to three hundred feet—He could see the ground below but that was it—He neither saw nor talked to Dr. Trimmer or Mr. Kelley before they took off from Pompano around eleven o'clock.

The in-flight advisories issued at 0830 and 1250 AIRMET ALPHA 8 were as follows over Florida and adjacent waters south of the Melbourne-Sarasota line—Ceiling frequently below one thousand feet and visibility occasionally less than two miles and rain and fog—Occasional moderate turbulence in embedded showers.

Whether taking off or continuing to fly under weather conditions here found to exist constitutes actionable negligence on the part of a private (non-commercial) pilot is debatable to say the least.

Three small aircraft were known to be flying between Pompano and Vero Beach on the morning in question—Both air-

ports were open for incoming and outgoing aircraft on the day in question. The record is silent as to the conditions at the other airports between Pompano and Richmond, Virginia. From the facts available the inference is they too were open for the use of aircraft.

It may be foolhardy but it is not negligence per se to take off or fly in the "bad weather" here described.

█ Assuming, without finding, that Dr. Trimmer was negligent in taking his plane off under the conditions found to exist, that is not enough—To recover the plaintiff must prove that the claimed negligence caused the aircraft to crash —This he has failed to do. We have no evidence, either direct or circumstantial, as to how or what caused the airplane in question to crash in the ocean off Melbourne Beach. We can only speculate.

> "To prove a possibility only, or to leave the issue to surmise or conjecture, is never sufficient to sustain a verdict." Hall v. Payne, 189 Va. 140, 52 S.E.2d 76 (1949).

█ Further, the maxim of res ipsa loquitur does not apply to the case of death in an airplane accident where the evidence fails to supply any proof as to the exact or proximate cause of the accident. See Morrison v. LeTourneau Co., 138 F.2d 339 (5th Cir. 1943).

The findings in the cases cited by the the facts here found. Those cases in the main delineate the duties imposed upon plaintiff are materially different from professional pilots—not private (noncommercial) pilots such as Dr. Trimmer.

█ Even if there be negligence in the premises, the statutory heirs of Roland Bev Kelley cannot recover—Their father assumed the risk—Weather conditions at take-off were open and obvious —He overheard the conversations between the Pompano manager-receptionist and Dr. Trimmer, and he must have heard the weather reports received en route to Vero Beach—He had sufficient experience with small airplanes to appreciate the danger of flying in weather conditions here found; nevertheless he voluntarily exposed himself to that danger.

For the reasons above stated this suit must be dismissed, and

It is so ordered.